# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTONIO POOLE (#M37390), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 16 C 11060 |
| v. | ) | |
| | ) | |
| JACQUELINE LASHBROOK, Warden, | ) | |
| Menard Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner Antonio Poole's petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254(d)(1). The Court denies Petitioner's habeas petition and declines to certify any issues for appeal under 28 U.S.C. § 2253(c)(2).

## BACKGROUND

When considering § 2254 habeas petitions, federal courts must presume as correct the factual findings made by the last state court to decide the case on the merits unless the habeas petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hicks v. Hepp,* 871 F.3d 513, 525 (7th Cir. 2017). Where Petitioner has not provided clear and convincing evidence to rebut this presumption, the following factual background is based on the Illinois Appellate Court's findings in *People v. Poole,* No. 1-13-2166, 2015 WL 5667068 (1st Dist. Sept. 25, 2015) (unpublished).

### I.    Factual Background

The State charged Petitioner by indictment with first degree murder in connection with the August 1, 2011 stabbing death of his roommate, Larry Dumas. Before his November 2012

jury trial, Petitioner filed a motion in limine indicating that he might assert self-defense asking the Circuit Court of Cook County judge to prevent the State from impeaching him with his November 1990 guilty plea and conviction in Michigan for second degree murder. On the same day, the State filed a motion seeking to introduce Petitioner's Michigan conviction for impeachment purposes.

At the motion hearing, the State informed the Circuit Court that Petitioner had spent nearly 20 years in prison based on a second degree murder conviction before being paroled on August 6, 2009. The State added that Petitioner then moved to Chicago and was arrested for Dumas' murder on August 1, 2011 while he was still on parole. The State then argued that Petitioner's Michigan conviction was relevant to the issue of his credibility. Defense counsel countered that the conviction occurred twenty years prior and would be "almost negligible" with respect to its probative value, but that the prejudicial effect on the jury would be "enormous." The Circuit Court denied Petitioner's motion and allowed the State to introduce the conviction for impeachment purposes should Petitioner testify – subject to a limiting instruction. Later, defense counsel filed a motion to reconsider and argued that should the Circuit Court reject his motion, he should be able to present evidence that the prior conviction resulted from a guilty plea. The Circuit Court denied the motion to reconsider concluding that Petitioner's release from prison, which was less than two years prior to the current offense, outweighed any prejudicial effect. The Circuit Court also denied defense counsel's request to produce evidence that the prior conviction was entered following a guilty plea unless counsel provided sufficient legal authority supporting this argument. Defense counsel did not provide any such authority.

At Petitioner's November 2012 jury trial, Charles Frazier testified that he, Lisa Davis (Frazier's girlfriend and Petitioner's sister), Petitioner, and Dumas lived on the second floor of a

two-flat apartment building at 7144 South Champlain Avenue in Chicago. Frazier had known

Dumas for about two years. According to Frazier, Dumas smoked crack daily and weighed

between 250 and 300 pounds. Frazier testified that there were two entries to their apartment,

namely, the front door in the foyer of the building (that locked), which led to the front door of

their second floor apartment (that did not lock), and the back door of the apartment (which did

not lock). Frazier said that the apartment's back door was secured with a two-by-four propped

against it, but Dumas would occasionally not secure the back door. Furthermore, Frazier

testified that at around 10:30 p.m. on July 31, 2011, he and Davis spent the night at 237 North

Sacramento Boulevard in Chicago where they were house-sitting. The next morning, Frazier

went to work, while Davis stayed at the Sacramento residence. Between 8 and 8:30 a.m. on

August 1, 2011, Petitioner called Frazier asking to speak with Davis. Frazier testified that about

5 to 10 minutes after that call ended, Petitioner called him again and Frazier spoke to both

Petitioner and Dumas.

Chicago police officer Carlton Cook also testified at Petitioner's jury trial stating that at

around 8:45 a.m. on August 1, 2011, he was alone on patrol in a marked vehicle traveling south

along the 6900 block of South Cottage Grove Avenue in Chicago. Officer Cook saw Petitioner

driving northbound sounding the car's horn, waving his arms, and yelling that he needed help.

Officer Cook immediately got out of his car. When Petitioner got out of his car, he fell to the

ground. Officer Cook observed that although Petitioner was conscious, there was blood on his

face, hands, shirt, arms, and legs. Officer Cook described Petitioner as hysterical and asked him

what had happened. According to Officer Cook, Petitioner told him that three individuals tried

to rob him near the basketball courts at a park by the intersection of East 72nd Street and South

Martin Luther King Drive. Further, Officer Cook testified that Petitioner could not provide any

additional details. Officer Cook then used his radio and asked for other units to search the basketball courts near the park around 72nd and King Drive for the possible assailants. An ambulance and other police officers arrived at the 6900 block of South Cottage Grove and Petitioner was transported to the hospital. Officer Cook testified that he was then alerted to another crime scene at 7144 South Champlain Avenue.

Kathleen Kelly testified at Petitioner's jury trial that at around 8:45 a.m. on August 1, 2011, she was on duty as a paramedic and received a call directing her to East 69th Street and South Cottage Grove Avenue. When Kelly arrived at the scene, she saw Petitioner was in the care of a firefighter. Petitioner was then placed on a stretcher and into the back of Kelly's ambulance, after which she transported him to the hospital. While en route, Kelly said that Petitioner was awake, alert, and oriented – despite his hands and upper torso being covered in blood. Kelly testified that Petitioner told her that he had been jumped by several teenagers, but escaped and drove to the police station.

In addition, the parties stipulated that, if she had been called to testify, Chicago police officer Kendra Pepper would have stated that she accompanied Petitioner to the emergency room, that Petitioner told her that he lived at 3856 South Lake Park in Chicago, and that he had been walking south on King Drive at 72nd Street when three black males walked up to him and demanded his money. According to Officer Pepper, Petitioner said he refused to give them his money, after which the three individuals punched and kicked him.

Another Chicago police officer, Jeffrey Brosseau, testified at Petitioner's trial stating that at 8:46 a.m. on August 1, 2011, he was directed to go to 72nd Street and Martin Luther King Drive to locate a crime scene. Officer Brosseau arrived within one minute and began looking for evidence, but he stated that there was no indication of a crime. In addition, Officer Brosseau

spoke to a woman who was at the park with her toddler and had been there for at least 20 minutes, but the woman saw nothing unusual.  Officer Brosseau then received a dispatch about a crime scene at 7144 South Champlain and went to that location.  When he arrived, Officer Brosseau saw an unresponsive black male lying at the top of the porch.

Chicago police detective Patrick Hackett testified that, at around 9 a.m. on August 1, 2011, he and his partner went to 7144 South Champlain to investigate a homicide.  When they arrived, they saw Dumas lying on the front porch and that there was a significant amount of blood on the front door, as well as the stairs leading up to the second floor.  Detective Hackett went to the back of the residence and up the stairs to the second-floor apartment.  He testified that he observed a large amount of blood puddled in a rug and a large blood-stained knife.  In addition, there was spattered blood on the dining room walls, in the living room, and on a comforter on a bed in the living room.  Detective Hackett then recovered a knife.  Thereafter, Detective Hackett and his partner went out the front door of the apartment and noticed a great deal of blood on the floor and the walls, as well as bloody footprints and a bloody shoeprint leading down the stairs.  Detective Hackett testified that he and his partner completed their investigation of the scene when they were informed of Petitioner waving down a patrolman.  The detectives then went to that scene.

When they arrived at East 69th Place, the detectives observed that Petitioner's car had bloodstains in it and learned that he had been transported to the hospital.  They went to the hospital and spoke to Petitioner, who told them that he lived at 3856 Lake Park with his sister, Sabrina Jennings.  Detective Hackett further stated that Petitioner claimed he left the Lake Park address earlier that morning to talk to someone about a job, but that person did not show up, so he went to the park at East 71st Street and South Martin Luther King Drive.  Petitioner told

Detective Hackett that after he arrived, three black males tried to rob him and stabbed him in the process, resulting in blood on his T-shirt, shorts, and shoes.

Chicago police officer Edward McCartan also testified at Petitioner's jury trial. He stated that on August 1, 2011, he was an evidence technician and that he and his partner were assigned to investigate the crime scene at 7144 South Champlain. At the crime scene, Officer McCartan saw blood everywhere and recovered a knife from the dining room floor, as well as a pair of glasses and a hat. Also, Officer McCartan testified that he and his partner went to where Petitioner's car was parked and observed blood on the seat and floor of the car from which they took blood swabs. Officer McCartan then went to the hospital and photographed Petitioner's injuries while Petitioner was being treated. Petitioner had a cut on his finger and a red mark on the side of his face.

Cook County assistant medical examiner Adrienne Segovia testified that she performed Dumas' autopsy on August 2, 2011. She testified that Dumas had a 1.2–inch vertical stab wound on the left side of his chest, horizontal incised wounds on the left side of his head and his right forearm, and scrape marks on the front of both lower legs. Further, she stated that Dumas died of a stab wound and multiple incise wounds. In particular, Dr. Segovia noted that the stab wound to Dumas' chest was inflicted with significant force and the forearm incise wound indicated a defensive injury. Last, Dr. Segovia noted that Dumas' blood tested positive for cocaine and its metabolites indicating recent use.

At Petitioner's jury trial, the State also presented testimony from three experts in the field of forensic DNA analysis, who were employed by Illinois State Police Forensic Science Center. First, Jennifer Belna testified that she analyzed the blood samples from the knife blade and handle, as well as the eyeglasses recovered from the South Champlain Avenue address. She

opined that the blood on the knife blade and handle was Dumas' and not Petitioner's blood. With respect to the eyeglasses, one of the two swabs only matched the Dumas' DNA, whereas the second swab contained a "major human male DNA profile" matching Dumas and a "minor human male DNA profile" from which Petitioner could not be excluded. Second, Meredith Misker testified that she analyzed the swabs from Petitioner's car and opined that the DNA in the blood samples matched only Dumas. In addition, Ms. Misker analyzed swabs from Dumas' right- and left-hand fingernails stating that those swabs contained a major profile matching Dumas and a minor profile from which Petitioner could not be excluded. Finally, Christine Prejean opined that the DNA in the blood swab taken from Petitioner's shoe only matched Dumas. The State then rested.

Petitioner testified on his own behalf explaining that he lived with his sister Lisa Davis, her boyfriend Frazier, and Dumas at the South Champlain Avenue apartment and that Petitioner had previously lived at the Lake Park residence with his other sister and brother-in-law. Petitioner further testified that he saw Dumas smoke crack every day, but Petitioner said he never had any problems with him. In addition, Petitioner recounted that on the night before the stabbing, he drove his sister and Charles Frazier to an apartment on Sacramento and then returned to the South Champlain Avenue apartment. He testified that at some point the next morning, he saw Dumas smoking crack in his room and smelled it. At around 8 a.m., Petitioner wanted to leave the apartment to go to his job. Petitioner explained that he wanted to ensure that all the doors were locked before he left, but he was concerned that Dumas might leave the apartment unlocked if Petitioner left before him. At that point, Petitioner tried to call his sister, but could not reach her, so he called Frazier and told him that he had to leave at 8:30 a.m. and

asked whether Frazier wanted him to leave and let Dumas lock up. About five minutes later, Petitioner called Frazier again.

Petitioner then started to leave the apartment, but as he entered into the dining room area, Dumas ran out of his room and hit Petitioner on the side of the face with such force that it knocked Petitioner over a glass table, to the couch, and then the floor. Petitioner testified that Dumas was on him – punching, swinging, and cutting him. Petitioner testified that he put his hands up and to stop the punches, shouted to Dumas to stop and calm down, and also tried to flee. Nonetheless, Dumas did not stop. Petitioner testified that he then rolled over and tried to get up and run, but Dumas kept grabbing him, hitting his legs, and knocking him down.

Furthermore, Petitioner testified that he tried to push Dumas away multiple times to escape, but Dumas kept grabbing and cutting him. At this point, Petitioner was on the floor with his back against two partial dividers between the dining and living room, and Dumas ran toward him full force. Petitioner testified that he told Dumas to stop, and when he put his hand down, he felt the knife that Dumas normally used to close his door. Petitioner testified that he picked up the knife and continued asking Dumas to stop. Nevertheless, Dumas ran at Petitioner, cut Petitioner on his side, and inflicted other injuries. Petitioner testified that Dumas – while charging forward – "ran into" the knife. He testified that he dropped the knife, turned, and ran from the apartment with Dumas chasing him. Petitioner testified that he thought Dumas was going to kill him, but when Petitioner ran down the steps to the front yard, he turned and saw Dumas on the porch. Petitioner ran to his car, looked back again, and this time saw Dumas sitting on the porch. Petitioner testified he did not think Dumas was fatally wounded. He testified that he then drove toward the police station at East 71st Street and South Cottage Grove Avenue, but flagged down a police officer on his way. He testified that he told the police officer

that he had been robbed because he did not want Dumas to get locked up, adding that Dumas was on crack and Petitioner did not believe that he knew what he had been doing. Petitioner testified that he stabbed Dumas because he thought Dumas was going to kill him.

In rebuttal, the State presented a certified copy of Petitioner's conviction for second degree murder in Michigan on November 1, 1990. The Circuit Court instructed the jury that it could consider the prior conviction as evidence with respect to Petitioner's believability as a witness, but not as evidence of his guilt.

At the sentencing hearing, the records administrator for the Michigan Department of Corrections confirmed that Petitioner pleaded guilty to second degree murder in Michigan on October 1, 1990 and was sentenced to 12 to 40 years of imprisonment on November 1, 1990. At the end of the sentencing hearing, the State argued that a mandatory life sentence was required due to Petitioner's prior second degree murder conviction in Michigan. Defense counsel disputed this, arguing that the State failed to show sufficient similarity between the second degree murder statute in Michigan and the first degree murder statute in Illinois. The Circuit Court agreed with the State finding sufficient similarity and noting that the Illinois legislature had taken away the Circuit Court's discretion with respect to this aspect of sentencing by requiring it to impose a natural life sentence.

## II.    Procedural Background

On direct appeal to the Illinois Appellate Court, Petitioner, by counsel, argued that: (1) the evidence was insufficient to convict him of first degree murder because the State failed to disprove his self-defense claim; (2) the Circuit Court abused its discretion by denying his request for a second degree murder instruction based on "serious provocation"; (3) the Circuit Court erred by ruling that his prior conviction for second degree murder was an aggravating factor

mandating a life sentence under Illinois law; (4) the Circuit Court abused its discretion by permitting the State to impeach him with his prior murder conviction; and (5) the Circuit Court abused its discretion by precluding him from introducing evidence that the prior conviction resulted from a guilty plea.  In his reply brief, Petitioner acknowledged that rather than unequivocally prohibiting the introduction of evidence that his prior conviction resulted from a guilty plea, the Circuit Court had ruled that it would consider the issue if defense counsel provided supporting legal authority, which defense counsel failed to do.  Accordingly, Petitioner added a new claim in his reply brief based on his trial counsel's ineffective assistance of counsel in this respect.

On September 25, 2015, the Illinois Appellate Court affirmed Petitioner's conviction concluding that the first four grounds of appeal were without merit and that Petitioner had forfeited the last ground and his ineffective assistance of counsel claim.  On October 16, 2015, Petitioner, by counsel, filed a petition for rehearing raising a new claim that appellate counsel was ineffective for failing to preserve the trial counsel claim.  The Illinois Appellate Court summarily denied the petition for rehearing.

On November 24, 2015, Petitioner, by counsel, filed a petition for leave to appeal ("PLA") to the Supreme Court of Illinois arguing that:  (1) the Circuit Court abused its discretion by denying his request for a second degree murder instruction based on "serious provocation"; (2) the Circuit Court abused its discretion by permitting the State to impeach him with his prior conviction for second degree murder; (3) his trial counsel provided ineffective assistance by failing to present legal authority to support an argument that he was entitled to introduce evidence that his prior conviction was the result of a guilty plea; and (4) his appellate counsel

was constitutionally ineffective by failing to preserve the claim that trial counsel was ineffective. On January 20, 2016, the Supreme Court of Illinois denied Petitioner's PLA.

Petitioner did not file a pro se post-conviction petition pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq*., and these claims are exhausted because the time to file his post-conviction petition has run. *See* 28 U.S.C. § 2254(c); 725 ILCS 5/122-1(c).

## III. Habeas Petition

On December 2, 2016, Petitioner filed the present pro se petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254(d). Construing Petitioner's pro se allegations liberally, *see Echols v. Craig,* 855 F.3d 807, 812 (7th Cir. 2017), he asserts that: (1) the State failed to disprove his claim of self-defense beyond a reasonable doubt; (2) the Circuit Court erred by permitting the State to impeach him with his prior second degree murder conviction; (3) the Circuit Court erred by precluding him from introducing evidence that the prior second degree murder conviction resulted from a guilty plea; (4) the Circuit Court erred by denying his request for a second degree murder instruction based on "serious provocation"; (5) the Circuit Court erred by ruling that his prior conviction for second degree murder was an aggravating factor mandating a life sentence under Illinois law; (6) trial counsel provided ineffective assistance of counsel for failing to present legal authority that Petitioner was entitled to introduce evidence that his prior second degree murder conviction resulted from a guilty plea; and (7) appellate counsel was ineffective for not bringing his ineffective assistance of counsel claim on direct appeal.

## LEGAL STANDARDS

## I. Habeas Relief

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court cannot grant habeas relief unless the state court's decision was contrary to, or an unreasonable

application of federal law clearly established by the Supreme Court. *See Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000); *Pinno v. Wachtendorf*, 845 F.3d 328, 331 (7th Cir. 2017). The Supreme Court has explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams,* 529 U.S. at 405. Under the "unreasonable application" prong, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *Id.* at 407. "Needless to say, the AEDPA standard of review is a difficult standard, and it was meant to be." *Baer v. Neal*, ___ F.3d ___, 2018 WL 358029, at *4 (7th Cir. Jan. 11, 2018).

## II.    Exhaustion and Procedural Default

"A federal habeas corpus petitioner is required to exhaust his available state remedies before seeking federal relief." *Lisle v. Pierce,* 832 F.3d 778, 785 (7th Cir. 2016) (citing 28 U.S.C. § 2254(b)(1)(A)). "Inherent in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus, is the duty to fairly present his federal claims to the state courts." *King v. Pfister,* 834 F.3d 808, 815 (7th Cir. 2016) (citation omitted). More specifically, a habeas petitioner must fully and fairly present his federal claims through one full round of state court review before he files his federal habeas petition. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999). If a habeas petitioner fails to fully and fairly present his federal claims through one full round of state court review, he has procedurally defaulted his claims. *Tabb v. Christianson,* 855 F.3d 757, 765 (7th Cir. 2017). Also, "a federal court may not review federal claims that were procedurally defaulted in state

court – that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). Procedural default precludes federal courts from reviewing the merits of a petitioner's habeas claims. *Thomas v. Williams,* 822 F.3d 378, 384 (7th Cir. 2016).

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice or by showing that the federal court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell,* 547 U.S. 518, 536, 126 S. Ct. 2064, 165 L.Ed.2d 1 (2006). The Supreme Court defines cause sufficient to excuse procedural default as "some objective factor external to the defense" which prevents a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier,* 477 U.S. 478, 492, 106 S. Ct. 2639, 91 L.Ed.2d 397 (1986); *Richardson v. Lemke*, 745 F.3d 258, 272 (7th Cir. 2014). Prejudice means actual prejudice infecting the "entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (citation omitted). A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496; *see also Hicks v. Hepp,* 871 F.3d 513, 531 (7th Cir. 2017).

## ANALYSIS

### I. Procedural Default

#### A. Fully and Fairly Present – One Complete Round of Appellate Review

Respondent argues that four of Petitioner's habeas claims are procedurally defaulted because Petitioner did not fully and fairly present these claims in one complete round of state court review. *See Hicks,* 871 F.3d at 530 ("petitioner must 'fairly present' his constitutional claims through at least one complete round of the state's established appellate review process

before presenting the claims to a federal court for habeas review.").  More specifically, Respondent highlights the following claims:  (1) the State failed to disprove his claim of self-defense beyond a reasonable doubt; (2) the Circuit Court erred by precluding him from introducing evidence that the prior second degree murder conviction resulted from a guilty plea; (3) the Circuit Court erred by ruling that his prior conviction for second degree murder was an aggravating factor mandating a life sentence under Illinois law; and (4) appellate counsel was constitutionally ineffective for not bringing his ineffective assistance of counsel claim on direct appeal.

Indeed, as to the first three habeas claims highlighted above, although Petitioner brought these claims on direct appeal to the Illinois Appellate Court, he did not present these claims in his direct appeal PLA to the Supreme Court of Illinois.  *See Brown v. Brown*, 847 F.3d 502, 517 (7th Cir. 2017) ("A federal court will not hear a state prisoner's habeas claim unless the prisoner has first presented it to the state courts for one full round of review.").  Similarly, the first time Petitioner raised his ineffective assistance of appellate counsel claim was in his petition for rehearing to the Illinois Appellate Court, which does not amount to a full and fair presentment under the circumstances.  *See Lewis v. Sternes,* 390 F.3d 1019, 1031 (7th Cir. 2004) (petitioner "does not fully and fairly present a federal claim to the state courts when he raises that claim for the first time in a petition for rehearing before the state appellate court.").  As such, Petitioner has procedurally defaulted his first, third, fifth and seventh habeas claims.

### B. Independent and Adequate State Law Grounds

Next, Respondent asserts that Petitioner has procedurally defaulted his sixth habeas claim, namely, that his defense counsel provided constitutionally ineffective assistance for failing to present legal authority supporting the argument that Petitioner was entitled to introduce

evidence that his prior second degree murder conviction resulted from a guilty plea because the

Illinois Appellate Court concluded this argument was waive.  To clarify, "federal courts will not

review questions of federal law presented in a habeas petition when the state court's decision

rests upon a state-law ground that is independent of the federal question and adequate to support

the judgment[.]"  *Richardson v. Griffin,* 866 F.3d 836, 842 (7th Cir. 2017) (citation omitted).

"To be 'adequate,' a state-law ground must be 'a firmly established and regularly followed state

practice at the time it is applied.'"  *Donelson v. Pfister,* 811 F.3d 911, 917 (7th Cir. 2016)

(citation omitted); *see also Crockett v. Butler,* 807 F.3d 160, 167 (7th Cir. 2015) (federal courts

"ask whether the rule invoked was 'firmly established and regularly followed.'") (citation

omitted).  A state law ground is independent "when the court actually relied on the procedural

bar as an independent basis for its disposition of the case."  *Lee v. Foster,* 750 F.3d 687, 693 (7th

Cir. 2014) (citation omitted).

Here, the Illinois Appellate Court concluded that Petitioner had waived his ineffective

assistance of trial counsel claim because he raised this argument for the first time in his reply

brief in contradiction of Supreme Court of Illinois Rule 341(h)(7).  As the Illinois Appellate

Court explained:

> Almost a century ago, our supreme court noted, 'Under the rules of this court and
> its long[-]settled practice, questions not raised by appellants in the original brief
> cannot be raised in the reply brief.  A contrary practice would permit appellants to
> argue questions in their reply briefs as to which counsel for appellees would have
> no opportunity to reply.'

*People v. Poole,* No. 1-13-2166, 2015 WL 5667068, at *12 (1st Dist. Sept. 25, 2015) (citations

omitted).

Despite the Illinois Appellate Court's ruling that relied upon the regularly followed

Supreme Court rule based on long-settled practice, Petitioner argues that he did not procedurally

default this claim because his appellate counsel was responding to an argument that the State made in its response brief, and thus the Illinois Appellate Court "had plenty of time to adjudicate this matter instead of saying the issue is waived." (R. 17, 4/17/17 Brief, at 13.) Turning to Petitioner's state court appellate reply brief, counsel argued that the Illinois Appellate Court should address the ineffective assistance of counsel claim acknowledging that "[i]t is well settled that issues raised for the first time in the appellant's reply brief shall be deemed waived on appeal," "[h]owever, the rule is an admonition to the parties and not a jurisdictional bar." *People v. Brownell,* 123 Ill. App. 3d 307, 319 (2d Dist. 1984). Further, counsel highlighted that "[i]ssues first raised in a reply brief may be addressed if a just result dictates consideration of all the issues." *Id.* Indeed, it is well-established that Illinois appellate courts may exercise discretion to consider claims that are waived, *see Wozniak v. Segal*, 56 Ill. 2d 457, 460 (1974), but here, the Illinois Appellate Court did not exercise that discretion. Accordingly, Petitioner has procedurally defaulted his ineffective assistance of trial counsel claim.

### C.     Exceptions to Procedural Default

The Court may reach the merits of Petitioner's procedurally defaulted claims if he can demonstrate cause for the default and actual prejudice or show that the Court's failure to consider the claim would result in a fundamental miscarriage of justice. Here, Petitioner asserts that his trial and appellate counsel were constitutionally ineffective establishing cause for his procedurally defaulted claims. Although "[m]eritorious claims of ineffective assistance can excuse a procedural default," the ineffective assistance of counsel claims "must themselves be preserved." *Richardson,* 745 F.3d at 272. In other words, Petitioner cannot use his claims of ineffective assistance of counsel to excuse his procedural default because he procedurally

defaulted these claims as well. *See Bolton v. Akpore,* 730 F.3d 685, 697 (7th Cir. 2013); *Promotor v. Pollard,* 628 F.3d 878, 887 (7th Cir. 2010).

Next, Petitioner argues that it would be a fundamental miscarriage of justice if the Court did not consider his ineffective assistance of trial and appellate counsel claims. Actual innocence or "the fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera v. Collins,* 506 U.S. 390, 404-05 (1993). To establish this exception, Petitioner must present new, reliable evidence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House,* 547 U.S. at 537 (citation omitted). After doing so, Petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo,* 513 U.S. 298, 327 (1995). As the Supreme Court teaches, "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup,* 513 U.S. at 329). Here, Petitioner has not pointed to any new, reliable evidence for the Court to consider, therefore, the fundamental miscarriage of justice exception does not apply to his procedurally defaulted claims.

## II.     Non-Cognizable Claims

In addition, Respondent maintains that all of Petitioner's habeas claims – except his Sixth Amendment ineffective assistance of counsel claims – are not cognizable on habeas review. As the Seventh Circuit teaches, "[f]ederal habeas corpus relief is not available to correct perceived errors of state law." *Crockett v. Butler,* 807 F.3d 160, 168 (7th Cir. 2015); *see also Estelle v.*

*McGuire,* 502 U.S. 62, 67, 112 S. Ct. 475, 116 L.Ed.2d 385 (1991) ("habeas corpus relief does not lie for errors of state law"); *King,* 834 F.3d at 814 ("[i]t is well-established that on habeas review, a federal court cannot disagree with a state court's resolution of an issue of state law").

Turning to Petitioner's first habeas claim, he argues that the State failed to disprove his claim of self-defense beyond a reasonable doubt. "Although Illinois has chosen to put the burden on the prosecution to disprove self defense beyond a reasonable doubt, this is not required by the federal constitution." *Ellis v. Butler*, No. 15 C 2240, 2015 WL 8988712, at *3 (N.D. Ill. Dec. 16, 2015) (quoting *Smith v. United States*, 568 U.S. 106, 110 (2013) ("[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required") (citation omitted)). As such, "[b]ecause disproving self defense is not required by the federal constitution as it not an element of Illinois' murder statute, Petitioner's argument that the prosecution failed to disprove his self defense claim beyond a reasonable doubt raises a non cognizable issue of state law." *Ellis,* 2015 WL 8988712, at *3; *see also Cobbs v. Calloway,* No. 16-CV-10380, 2017 WL 4772704, at *6 (N.D. Ill. Oct. 23, 2017) (same).

Respondent further argues that the Circuit Court's evidentiary rulings are not cognizable on habeas review. These claims include that the Circuit Court erred by permitting the State to impeach Petitioner with his prior murder conviction and the Circuit Court erred by precluding Petitioner from introducing evidence that the prior murder conviction resulted from a guilty plea. *See Anderson v. Sternes,* 243 F.3d 1049, 1053 (7th Cir. 2001) ("state court evidentiary errors do not normally entitle a defendant to habeas relief."). Nonetheless, "[s]tate court evidentiary rulings [may] implicate the Due Process Clause when "evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice[.]'" *Richardson,* 745 F.3d at 275 (quotation omitted). Although Petitioner maintains that he was denied due process when the

Court allowed the State to impeach him with his prior conviction, any such impeachment "has never been viewed as posing any potential of constitutional invalidity." *Torres v. Chandler,* 370 F. Supp. 2d 755, 758 (N.D. Ill. 2005). Similarly, Petitioner's claim based on the Circuit Court precluding him from introducing evidence that the prior murder conviction resulted from a guilty plea fares no better, especially because the Circuit Court ruled it would consider this issue if trial counsel provided supporting case law. *See Richardson,* 745 F.3d at 275 ("claims based on the 'catch-all sense of due process' almost always fail").

Likewise, Respondent argues that the following habeas claims are not cognizable because they focus on state law – the Circuit Court erred by denying Petitioner's request for a second degree murder instruction based on "serious provocation" and the Circuit Court erred by ruling that Petitioner's prior murder conviction was an aggravating factor mandating a life sentence under Illinois law. *See Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) ("it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts[.]") Indeed, Petitioner's claims based on the Circuit Court's jury instruction and sentencing issues are not cognizable on collateral review, and thus the Court cannot determine the merits of these claim. *See Estelle,* 502 U.S. at 71-72 ("the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief"); *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002) (error in "the application of state sentencing rules, does not present a cognizable claim for federal habeas relief").

## III.     Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant

Petitioner a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in the present ruling. Simply put, a habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *See Miller-El v. Cockrell,* 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Flores-Ramirez v. Foster,* 811 F.3d 861, 865 (7th Cir. 2016) (per curiam). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; 28 U.S.C. § 2253(c)(2). In cases where a district court denies a habeas claim on procedural grounds, a certificate of appealability should issue only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 485, 120 S. Ct. 1595, 146 L.Ed.2d 542 (2000).

Here, Petitioner has not established that reasonable jurists would debate that his first five habeas claims based on Illinois law are not cognizable on habeas review. In addition, a reasonable jurist would not conclude the Court erred in ruling that Petitioner has procedurally defaulted his first, third, fifth, sixth, and seventh habeas claims. *See id.* at 484 ("Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case," the claim is not debatable). As such, the Court declines to certify any issues for appeal. *See* 28 U.S.C. § 2253(c)(2).

**CONCLUSION**

For these reasons, the Court denies Petitioner's petition for a writ of habeas corpus and

declines to certify any issues for appeal. *See* 28 U.S.C. §§ 2253(c)(2), 2254(d)(1).

**Dated:** January 30, 2018

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**